UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:10CR148 (EBB) |
| v. | : | |
| | : | |
| ALLEN BAILEY | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Government respectfully submits this Sentencing Memorandum with regard to defendant Allen BAILEY, a.k.a. "Cheese" (the "defendant").

## I.      INTRODUCTION AND BACKGROUND

On August 30, 2011, a Hartford Grand Jury returned a multi-count superseding indictment charging 33 defendants with assorted violations of the Controlled Substances Act.   The defendant was charged in Counts Twenty-Five through Twenty-Eight with possession with intent to distribute and distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and/or 841(b)(1)(C), and in Count Fifty-Three with use of a telephone to facilitate the commission of a drug-trafficking felony, in violation of 21 U.S.C. § 843(b).

On June 7, 2012, the defendant pled guilty to Count Twenty-Eight, charging him with possession with intent to distribute and distribution of 28 grams or more of cocaine base.   On that date, the defendant entered into a plea agreement with the Government.   On May 30, 2014, the defendant and the Government entered into a supplemental plea agreement.   Together, the June 7, 2012 and the May 30, 2014 written agreements constitute the entire plea agreement between the parties.

In the plea agreement, the defendant and the Government agreed that there are litigable issues as to whether the Government can prove that the defendant is a career offender under

1

U.S.S.G. § 4B1.1 as a result of his prior convictions and, as part of the supplemental plea agreement, the Government agreed that it will not seek to enhance the defendant's Guideline range under U.S.S.G. § 4B1.1.

In the plea agreement, the parties agreed that the defendant's relevant and reasonably foreseeable offense conduct involved 78.5 grams of cocaine base and 10 grams of heroin, which yields a base offense level of 24 under the current Guideline Manual.   The parties further agreed that three levels should be subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, which results in an adjusted offense level of 21.   Both parties agreed that the defendant appeared to be in either Criminal History Category VI, which results in a guideline range of 77 to 96 months of imprisonment.

The defendant reserved the right to seek a downward departure or a non-guidelines sentence and the Government reserved the right to oppose any such requests and to seek whatever sentence it believes is appropriate.

As part of the plea agreement, the defendant waived his right to appeal or collaterally attack his conviction or sentence of imprisonment if his sentence does not exceed 96 months of imprisonment, a $5,000,000 fine and 4 years of supervised release.   If the sentence does exceed 96 months of imprisonment, a $5,000,000 fine and 4 years of supervised release, the defendant may appeal the sentence only, not the underlying conviction.

## II.     FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

During the Summer of 2009, the Federal Bureau of Investigation ("FBI"), the Hartford Police Department ("HPD") and the Connecticut State Police ("CSP") began investigating gang and drug related activity in the Northeast section of Hartford.    In particular, the investigation focused on geographically based gangs engaging in criminal activity in the Upper Albany and

2

Northeast neighborhoods.   One of the predominant street gangs operating in this area is commonly referred to as the AVE, or Avenue, in reference to Albany Avenue.   The AVE is comprised of or associated with several subsets or "sets" which further define or identify the geographical area which they control and engage in criminal activity.   The investigation also focused on criminal activity in the area of Enfield and Mansfield Streets, an area historically controlled by individuals associated with the AVE.   AVE gang members consider themselves affiliated in their criminal activity, especially as it pertains to furthering their illegal drug distribution, protecting their territory and perpetrating acts of violence against rival gangs.

Beginning in the Summer of 2009, investigators coordinated the controlled purchase of narcotics from targets associated with the AVE.   One of the initial targets of the narcotics investigation was Allen BAILEY, a.k.a. "Cheese."   Between March and June 2010, investigators conducted four controlled purchases of narcotics from BAILEY.

Specifically, with regards to Count Twenty-Eight of the superseding indictment, investigators conducted a controlled purchase of 70 grams of cocaine base from BAILEY on June 25, 2010.   On that date, a cooperating human source ("CHS") made a consensually recorded telephone call to BAILEY to arrange to purchase 125 grams of crack cocaine in exchange for $2,500.   BAILEY agreed to meet with the CHS on Enfield Street in Hartford. Prior to the CHS traveling to Enfield Street, the CHS and his/her vehicle were searched for excess monies and/or contraband with negative results.   The CHS was provided with $2,500 in pre-recorded monies, a recorder and a transmitting device.   While traveling to Enfield street, the CHS received a call from BAILEY, who said that he was ready and waiting on Enfield street. The CHS was surveilled as he/she traveled to Enfield street and parked near 93-95 Enfield Street. Investigators observed BAILEY walk across the street to the CHS's vehicle and then enter the

CHS's car.   Inside the car, BAILEY provided the CHS with a plastic baggie containing a large chunk of an off-white chalk-like substance (i.e., suspected crack cocaine) in exchange for the buy money.   BAILEY then exited the CHS's vehicle and crossed the street into the driveway of 101-103 Enfield Street.   Investigators surveilled the CHS drive back to a secure location, where investigators retrieved from the CHS the recording device, the transmitting device and the suspected crack cocaine.   The CHS was searched for excess monies and/or contraband with negative results.   In addition, the CHS was debriefed by investigators.   It was determined that BAILEY had only provided the CHS with approximately 70 grams of crack cocaine.

The CHS then conducted two consensually recorded telephone calls to BAILEY. BAILEY refused to talk about the shortage over the phone and suggested that the CHS come to Enfield Street to discuss the matter.   The CHS was again outfitted with a recorder and transmitting device and was surveilled as he/she traveled to Enfield Street, where he/she met with BAILEY.   During this meeting, BAILEY said that he was confused over the telephone. BAILEY understood that the CHS wanted 30 eight balls of crack cocaine and his (BAILEY's) source of supply stated that the product provided would yield 30 eight ball quantities.   BAILEY said that it could have been water weight giving a false read on the scale.   BAILEY agreed to provide the CHS with more product once he (BAILEY) obtained more from his supplier.

The suspected cocaine base obtained from BAILEY on June 25, 2010 was sent to the DEA Northeast Laboratory, which concluded that the substance was in fact cocaine base and had a net weight of 70.9 grams.

In addition to the controlled purchase on June 25, 2010, investigators used a cooperating human source to conduct three prior controlled purchases of narcotics from BAILEY as follows: (1) 130 bags of heroin on March 12, 2010; (2) $900 worth of heroin on June 18, 2010; and (3)

$300 worth of crack on June 22, 2010.     Testing at the DEA laboratory revealed that BAILEY provided the following substances during these three controlled purchases: (1) 2.6 grams of heroin on March 12, 2010; (2) 7.4 grams of heroin on June 18, 2010; and (3) 7.6 grams of cocaine base on June 22, 2010.    Based on these controlled purchases of narcotics from the defendant, BAILEY's relevant and readily foreseeable offense conduct involved 78.5 grams of cocaine base and 10 grams of heroin.

In addition to the above-described offense conduct, in August 2010, Hartford police officers received information from an confidential informant (CI) that the defendant and two other individuals were selling narcotics from the first floor apartment at 126 Enfield Street in Hartford.    The CI said that BAILEY was in possession of a .40 caliber handgun and that the three males "stashed" drugs and firearms in the basement of 126 Enfield Street.    On August 30-31, 2010, officers surveilled a steady "flow" of people who looked like narcotics buyers go to 126 Enfield Street.    The alleged buyers would engage a black male in a brief conversation at the door to 126 Enfield Street, the black male would close the door and then return moments later and hand the awaiting buyer a small item.    On August 31, 2010, HPD officers had a CI go to 126 Enfield Street and make a controlled purchase of $20 worth of crack cocaine from the defendant.

On September 1, 2010, investigators executed a state search warrant at the first floor residence at 126 Enfield Street.    BAILEY and two other associates were present during the search.    During the search, investigators seized, *inter alia*, the following evidence: a silver Taurus .40 caliber handgun; a clear plastic bag that contained 28 clear plastic bags each containing crack cocaine; a knotted piece of plastic containing approximately 63 grams of crack cocaine; another plastic bag containing suspected crack cocaine; a Hartford Police Property

receipt with Allen Bailey's name; multiple cell phones; a black digital scale; bags containing

suspected marijuana; narcotics packaging materials; over $800 in U.S. currency; and a clear bag

containing 28 .40 caliber rounds, each marked "Winchester."   The defendant and his two

associates denied knowledge of the drugs and the gun.   They also denied residing in the first

floor apartment at 126 Enfield Street.   The defendant and one associate both said they were

visiting a friend, but could not provide a name for the alleged friend.

### III.   THE DEFENDANT'S GUIDELINE RANGE

Pursuant to the plea agreement, the parties agree that the defendant's relevant and

reasonably foreseeable offense conduct involved 78.5 grams of cocaine base and 10 grams of

heroin.   This yields a base offense level of 24 under the current Guideline Manual.   The parties

further agree that three levels should be subtracted under U.S.S.G. § 3E1.1 for acceptance of

responsibility, which results in an adjusted offense level of 21.   Both parties agree that the

defendant appeared to be in either Criminal History Category VI.   A total offense level 21 and a

Criminal History Category VI would result in a guideline range of 77 to 96 months of

imprisonment and a fine range of $7,500 to $5,000,000, pursuant to U.S.S.G. § 5E1.2(c).   The

defendant is also subject to a supervised release term of 4 years to life.   See U.S.S.G. § 5D1.2.

### IV.   A GUIDELINE SENTENCE IS REASONABLE AND APPROPRIATE

The Government respectfully submits that the Court should impose a sentence at or near

the low end of the defendant's Guideline imprisonment range of 77 months of imprisonment for

several principal reasons.   First, such a sentence should be imposed to reflect the seriousness of

the criminal activity committed by the defendant.   The defendant was distributing crack cocaine

in a neighborhood that is plagued by drug dealing and its associated violence.   The Government

submits that this is very serious criminal conduct.   Drug crimes are often thought of as victimless,

6

but that is hardly the case.   Not only do drugs frequently destroy the person who uses them, but they often destroy entire families and communities.   Trafficking in drugs like cocaine base has had a particularly destructive impact on residents, families and communities in Connecticut's urban centers, like Hartford.   A sentence to a significant term of imprisonment is necessary to reflect the seriousness of the defendant's drug trafficking activities, as well as to promote respect for the law and to provide just punishment for the offense.   See 18 U.S.C. § 3553(a)(2)(A).

Second, a sentence at or near 77 months of imprisonment would appropriately reflect the defendant's history and characteristics.   The Government acknowledges that the defendant had an extremely difficult and traumatic childhood, which is a mitigating consideration.   On the other hand, the defendant has an extensive criminal history which spans much of his adult life.   As detailed in the PSR, the defendant has 23 criminal history points, placing him well in Criminal History Category VI.   See PSR ¶ 44.   The defendant has numerous prior felony convictions, including convictions for, *inter alia*, the following crimes: Sale of Narcotics (two); Assault on a Peace Officer; Assault 1; Robbery 1; Assault 2; Possession of Narcotics; Larceny 3; Tampering with Evidence; and Larceny 2.   See PSR ¶¶ 28-43.   In addition, the defendant has misdemeanor convictions for: Breach of Peace; Assault 3; Possession of Drugs; Interference (two); Disorderly Conduct; and Civil Contempt.   See id.

With regards to the defendant's two most-recent convictions, the PSR provides detailed information regarding the defendant's offense conduct.   See PSR ¶¶ 42-43.   In connection with the defendant's conviction for Sale of Narcotics and Assault on a Peace Officer in April 2003, the police report reveals that: during a traffic stop, Hartford Police officers observed crack cocaine and currency protruding from his front shirt pocket; upon realizing that the officer had identified these items, the defendant sped off; the defendant dragged a police officer who was attempting to

7

remove the defendant from his car "approximately 20 to 30 feet"; the defendant "led police on a reckless car chase including sideswiping a large tree, traffic sign and caused his car to go airborne"; the defendant's car "was documented as being within inches of striking several neighborhood children that were playing the street"; and the defendant "attempted to continue to accelerate on the gas pedal even after hitting the tree" and immobilizing his car.   See PSR ¶ 42. In connection with the defendant's Breach of Peace conviction in November 2009, a Hartford police report states that, during a birthday party, a complainant observed the defendant "grabbing her cousin [the victim] . . . by the neck with both hands and slammed her against the side of the house."   See PSR ¶ 43.   The victim stated that "her father and brothers removed [the defendant] from choking her."   See id.

      The defendant has spent much of his adult life in state imprisonment, on state probation or parole, or on pre-trial release with pending criminal charges.   See id.   According to the PSR, "the defendant has served approximately 17 years and five months in DOC custody."   See PSR ¶ 43. While in state incarceration between May 1989 and June 2009, the defendant received 52 tickets for, among other things, "Violating Program Provisions, Fighting, Flagrant Disobedience, Contraband Class A and B, Disorderly Conduct, Violation of Unit Rules, Disobeying a Direct Order, Threats, Assault on a DOC Employee, Sanitary/Housing Violation, Giving False Information, Interfering with Staff, Insulting Language, and Loitering."   See id.   "As a result of his behavior, [the defendant] has received discipline that has included losing good time, punitive segregation, loss of privileges, extra duty, and confinement to quarters."   See id.   The defendant has committed much of his criminal activity while on state parole, state probation or pretrial

release in connection with pending criminal charges.    Indeed, the defendant committed the instant offense while on state probation.   See PSR ¶ 59.

To the defendant's credit, since his arrest on October 18, 2010 in the instant matter, the defendant has taken advantage of his opportunities at Wyatt and, with the exception of a disciplinary ticket on August 18, 2012 for fighting, has exhibited model behavior.   Defense counsel has submitted a letter from the Wyatt warden dated November 3, 2014 praising the defendant for his work ethic and behavior.   In addition, defense counsel has submitted certificates showing that the defendant has successfully completed several programs, including Rational Thinking, Parenting Skills, Alcoholics Anonymous and Changing Criminal Lifestyles.

Third, a sentence at or near the low end of the defendant's guideline imprisonment range would appropriately protect the public from further crimes of the defendant, see 18 U.S.C. § 3553(a)(2)(C), and provide adequate deterrence to future criminal conduct of the defendant and others.   See 18 U.S.C. § 3553(a)(2)(B).   Such a prison sentence would send the much needed message not only to the defendant, but also to other like-minded individuals, that distributing cocaine base – particularly, by a convicted felon with multiple prior convictions who was on state probation when he committed the crime – will not be tolerated by this Court.

Last, the Government agrees with the PSR's recommendation that the defendant would "benefit from the Bureau of Prison 500 hour [Residential Drug Abuse] program, as well as vocational training, and completing his GED."   See PSR ¶ 91.

## IV.   **CONCLUSION**

For the foregoing reasons, the Government submits that a sentence at or near the low end of the defendant's Guideline imprisonment range, which is 77 to 96 months of imprisonment, would

be reasonable, appropriate and not greater than necessary to achieve the purposes of sentencing

under 18 U.S.C. §3553(a).

                                    Respectfully submitted,

                                    DEIRDRE M. DALY
                                    UNITED STATES ATTORNEY

                                    /s/ *Geoffrey M. Stone*

                                    GEOFFREY M. STONE
                                    ASSISTANT UNITED STATES ATTORNEY
                                    Federal Bar No.   CT 25326

## CERTIFICATE OF SERVICE

       This is to certify that on December 9, 2014, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.

                                    /s/ *Geoffrey M. Stone*

                                    _____

                                    GEOFFREY M. STONE
                                    ASSISTANT UNITED STATES ATTORNEY